UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ORLANDO A. COLON,

                   **MEMORANDUM AND ORDER**

        Plaintiff,              16-CV-3043 (RRM)

       - against -

ACTING COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.
-----------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Orlando A. Colon ("Colon") brings this action against defendant Nancy

Berryhill, Acting Commissioner of the Social Security Administration (the "Commissioner"),

pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). Colon seeks review of the determination of an

administrative law judge ("ALJ") that he is entitled to neither Disability Insurance Benefits

("DIB") nor Supplemental Security Income ("SSI") under Title II and Title XVI of the Social

Security Act, respectively. Both Colon and the Commissioner have moved for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). (Def.'s Mem. (Doc. No.

21); Pl.'s Mem. (Doc. No. 19).) For the reasons set forth below, Colon's motion is denied, and

the Commissioner's motion is granted.

## BACKGROUND

### I. Procedural History

On August 21, 2012, Colon applied for DIB and SSI, claiming that the pain in his back

and knees precluded him from working. (Admin. R. at 195, 208.) He alleged that he had

suffered from arthritis in his knees and back since May 20, 2010. (*Id.* at 225.) His applications

were denied on December 19, 2012. (*Id.* at 141–46.) Colon then requested a hearing before an

ALJ. (*Id.* at 150.) On August 14, 2014, he appeared with counsel before ALJ Kieran

McCormack.  (*Id.* at 28.)  By the decision dated August 20, 2014, the ALJ found that Colon was

not eligible for SSI or DIB.  (*Id.* at 8.)  Colon requested review by the Appeals Council.  (*Id.* at

8–11.)  On April 19, 2016, the Appeals Council denied Colon's request for review, thus

rendering the ALJ's decision final.  (*Id.* at 1–6.)  This action followed.

## II. Administrative Record

### a.  Non-Medical Evidence

Colon was 47 years old at the time of the ALJ's decision.  (*Id.* at 195.)  He attended

school through the tenth grade.  (*Id.* at 226.)  He worked as a security guard from 1991 to 1993,

and from 2000 to 2010.  (*Id.* at 36, 226.)  He also worked as a machine operator in 1993, a floor

person in a factory from 1994 to 1996, and a packer in 1996.  (*Id.* at 226.)

In his SSI and DIB applications, Colon alleged disability from spurs and arthritis in both

of his knees and his back, in addition to hypertension.  (*Id.* at 195, 208, 225.)  He claims that he

had been unable to work due to this disability since January 1, 2012.  (*Id.* at 208.)  In a function

report dated September 8, 2012, Colon explained that his back and knee pain started in June

2012.  (*Id.* at 234, 242.)  He described the pain as sharp and located "in [his] bones . . . all over

[his] body" throughout the day regardless of activity.  (*Id.* at 242.)  His treating physician, Dr.

Spieler, prescribed 800 milligrams of Ibuprofen for use three times per day since June 2012.  (*Id.*

at 243.)  However, it only relieved the pain for roughly 30 minutes.  (*Id.* at 242–43.)  Colon

stated he had never taken any other medications to alleviate the pain.  (*Id.* at 244.)

In the function report, Colon also explained how the recurring pain has limited his daily

activities.  For example, the pain required him to return to bed throughout the day.  (*Id.* at 235.)

In addition, he claimed it takes him more than 30 minutes to get dressed and that it was difficult

to raise his legs to get into the shower.  (*Id.*)  Colon added that he no longer engages in

community activities or events on a regular basis due to the pain.  (*Id.* at 239, 244.)  However, he is capable of leaving his home roughly twice a week in order to go grocery shopping.  (*Id.* at 237.)  In the report, Colon also stated that he lived in an apartment with friends.  (*Id.* at 234.)  His mother stopped by to cook and clean for him daily while his friends helped him with the laundry.  (*Id.* at 237.)

Colon also detailed the extent of his physical abilities in the function report.  He stated he could not lift heavy items, walk long distances, sit or stand for long periods of time, climb stairs, kneel, or squat.  (*Id.* at 239–40.)  He also reported that he had difficulty reaching for items and using his hands due to back pain and arthritis.  (*Id.* at 240.)  He used a cane prescribed by his doctor and indicated he could walk for 15 minutes before he needed to stop and rest for five minutes.  (*Id.* at 240–41.)  He stated he had no problems with memory or paying attention, and could follow spoken, but not written, instructions.  (*Id.* at 241–42.)  Furthermore, Colon alleged he had no difficulty getting along with bosses, teachers, police, landlords, or other people in positions of authority.  (*Id.* at 241.)

In August 2014, Colon testified in a hearing before the ALJ to support his claim for SSI and DIB.  (*Id.* at 28.)  He stated that he suffered from a torn meniscus in his right knee, arthritis in both knees, and a torn Achilles tendon.  (*Id.* at 47.)  As a result, sitting for a prolonged period, standing, and lying down caused him pain.  (*Id.* at 45.)  Pain in both knees limited his ability to walk more than a block and a half without any breaks.  (*Id.* at 48.)  Specifically, Colon testified that the pain in his right knee was particularly severe.  (*Id.* at 46–47.)  Although he took pain pills and muscle relaxers, he reported that he still woke up at night in pain.  (*Id.* at 44, 54.)  Colon further complained that the pills caused drowsiness and a dry mouth.  (*Id.* at 45, 54.)

In his testimony, Colon stated his back and knee problems continued to influence his

daily living.  More specifically, he could shower and dress himself, but his brother helped him put on socks and shoes.  (*Id.* at 51.)  Although Colon could make a sandwich for himself, his mother did most of the cooking, cleaning, and laundry.  (*Id.* at 49, 51.)  Regarding household chores, he took the garbage out and sometimes went to the store for his mother, but avoided carrying too many heavy items.  (*Id.*)  For most of the day, Colon read about sports online, watched television, and listened to the radio.  (*Id.* at 50.)

Colon also testified that he was laid off from his job as a security guard in 2010.  (*Id.* at 36, 38.)  In 2013, his supervisor wanted to re-hire him but Colon could no longer work due to his back and knee issues.  (*Id.* at 39.)  Similarly, he declined a coaching job for boxing in 2014 because he was not in shape and walked with a cane.  (*Id.* at 53–54.)

### b.  Medical Evidence Prior to Colon's August 21, 2012 SSI and DIB Application

#### i.  Leah Spieler, M.D., Treating Physician (May – August 2012)

From May 2012 to August 2012, Colon visited Dr. Leah Spieler, M.D., multiple times at Community Healthcare Network, CABS Health Center.  (*Id.* at 292.)  On May 1, 2012, Colon visited Dr. Spieler and complained that he suffered from lower back and knee pain "inconsistently for years."  (*Id.*)  Dr. Spieler assessed that Colon was 62.25 inches tall, weighed 191 pounds, his blood pressure was 142/112, and his body mass index ("BMI") was 34.65.  (*Id.*)  On examination, Colon demonstrated 5/5 motor abilities bilaterally, proximally, and distally in all four extremities, and had a normal range of motion in the spine.  (*Id.*)  Colon's responses to a screening questionnaire suggested that he suffers from mild depression.  (*Id.*)  Dr. Spieler counseled Colon on diet and exercise, and provided information about mental health services.  (*Id.* at 293.)  She further ordered that Colon undergo blood tests and x-rays of his lumbar spine and knee.  (*Id.*)  On May 15, 2012, the results revealed that Colon suffered from hyperlipidemia

and Dr. Spieler counseled him on lowering his cholesterol.  (*Id.* at 289–92.)

On June 1, 2012, Colon visited Dr. Spieler due to the onset of flu-like symptoms.  (*Id.* at 287.)  Dr. Spieler determined that Colon experienced hypertension.  (*Id.*)  For treatment, she prescribed him hydrochlorothiazide tablets and discussed salt intake and exercise.  (*Id.*)

On July 16, 2012, Colon returned to Dr. Spieler and reported that he was doing well, and that he had no complaints regarding his hyperlipidemia.  (*Id.* at 284.)  Colon was walking more, and had lost 6.8 pounds since his last visit.  (*Id.*)  Blood pressure was 145/110 in his right arm and 132/110 in his left arm.  (*Id.*)  Dr. Spieler changed his hypertension medication from a diuretic to a beta blocker, recommended that Colon stop smoking, and renewed his prescription for Ibuprofen.  (*Id.* at 284–85.)

On July 23, 2012, Colon visited Dr. Spieler again with complaints of sharp knee pain. (*Id.* at 282.)  He stated he had difficulty walking after helping a friend move a mattress a day earlier, but denied any locking, catching or "giving way" sensations.  (*Id.*)  Examination of the left knee revealed diffuse tenderness, normal alignment, no effusion, no erythema, and an essentially painless range of motion.  (*Id.* at 283.)  Dr. Spieler instructed Colon to take 800 milligrams of Ibuprofen three times per day.  (*Id.*)

On August 13, 2012, Colon returned to Dr. Spieler for a follow-up appointment regarding his hypertension.  (*Id.* at 280.)  During the meeting, Colon reported no symptoms of depression. (*Id.*)  During the appointment, his blood pressure was measured to be 150/112.  (*Id.*)  Dr. Spieler advised Colon to eat a low-salt diet, increase his water intake, and exercise regularly.  (*Id.*)  Dr. Spieler also noted that Colon's left foot had a bony protrusion on the heel.  (*Id.*)

### ii.    Woodhull Medical and Mental Health Center

On May 7, 2012, Colon underwent x-rays at the Woodhull Medical and Mental Health

Center in Brooklyn. (*Id.* at 275.) Lumbar spine x-rays revealed mild degenerative changes in Colon's back. (*Id.*) Bilateral knee x-rays revealed no acute displaced fracture, no dislocation, and no significant suprapatellar fluid. (*Id.* at 276.) However, they indicated that Colon suffered from mild bilateral patellar spurring in his knee. (*Id.*)

### c. Medical Evidence After Colon's August 21, 2012 SSI and DIB Application

#### i. Gabriel Welch, M.D. (August 2012)

On August 27, 2012, Colon visited Dr. Gabriel Welch at the Woodhull Medical and Mental Health orthopedic clinic to evaluate lower back and bilateral knee pain. (*Id.* at 269.) He reported that he was currently undergoing physical therapy. (*Id.*) On examination, Colon had full range of motion, intact neurological vital signs, and no focal deficits. (*Id.*) Dr. Welch advised him to continue with physical therapy and pain management and return to the clinic for a follow-up in six months. (*Id.*)

#### ii. Williamsburg Medical Imaging (November 2012)

On November 8, 2012, Colon underwent magnetic resonance imaging ("MRI") of both knees. (*Id.* at 297.) In his right knee, the results revealed: medial meniscal tears; grade 1 anterior cruciate ligament ("ACL") and medial collateral ligament ("MCL") sprains; mild soft tissue swelling; no fractures or dislocations; mild to moderate medial compartment degenerative arthritis with mild degenerative change throughout the remainder of the right knee; moderate-sized right knee joint effusion; and mild patellar and quadriceps tendinosis. (*Id.*) In his left knee, the MRI revealed: moderate medial compartment and patellofemoral compartment degenerative arthritis; no meniscal or ligamentous tear; mild soft tissue swelling; mild lateral patellar subluxation; small left knee joint effusion; and mild patellar and quadriceps tendinosis. (*Id.* at 299.) The MRI of Colon's lumbar spine revealed that he suffered from multi-level disc

disease of the lower lumbar spine.  (*Id.* at 301.)  More specifically, the findings revealed that productive facet joint change at the L3/L4 level and thin broad-based central disc herniation contributed to mild central canal stenosis.  (*Id.* at 300.)  Thin central disc herniation at the L4/L5 level and ligamentum flavum hypertrophy also contributed to mild central canal stenosis.  (*Id.*)  Broad-based central disc herniation at L5/S1 level was associated with mild bilateral intervertebral foraminal encroachment.  (*Id.* at 301.)

### iii.     Leah Spieler, M.D., Treating Physician (January 2013)

On January 11, 2013, Colon returned to Dr. Spieler for continuing back and knee pain. (*Id.* at 372.)  Dr. Spieler prescribed Tramadol for pain and referred Colon to physical therapy as per his request.  (*Id.*)

### iv.     Craig Preston Herman, D.P.M.  (January 2013 – March 2014)

On January 9, 2013, Colon went to Dr. Craig Preston Herman, D.P.M., at CABS Health Center for a follow-up evaluation regarding left heel pain and his Achilles tendinitis.  (*Id.* at 374.)  Colon reported that he was using a night splint and had recently obtained orthotics.  (*Id.*)  He did not have any new complaints.  (*Id.*)  Dr. Herman assessed that Colon also had Achilles bursitis and a calcaneal spur.  (*Id.*)  As treatment, Dr. Herman suggested that Colon continued stretching and using orthotics.  (*Id.*)

On February 7, 2013, Dr. Herman administered a trigger point injection in Colon's left Achilles bursa.  (*Id.*)  He also recommended that Colon continue using molded orthotics, the night splint, and supportive shoes, in addition to engaging in stretching exercises.  (*Id.*)

On April 4, 2013, Dr. Herman assessed that Colon felt pain at the insertion of the Achilles tendon to the calcaneus and had tight gastroc and soleus muscle groups.  (*Id.* at 426.)  He recommended the continued use of orthotics, supportive shoes and the night splint during the

day whenever Colon sat down for half an hour or more. (*Id.*) He also mentioned that Colon may require immobilization if he does not improve. (*Id.*)

On April 11, 2013, Dr. Herman assessed that Colon's Achilles tendinitis had not improved. (*Id.* at 358.) In fact, his Achilles tendon was partially torn. (*Id.*) Dr. Herman referred Colon to an orthotist for a cam walker and recommended its use at all times except when sleeping and bathing. (*Id.*)

On May 30, 2013, Colon once again visited Dr. Herman. (*Id.* at 354.) He assessed that Colon's Achilles tendinitis had not improved and his Achilles tendon remained partially torn. (*Id.*) Dr. Herman sent a prescription for a compounded topical cream consisting of Solaraze 3%, Emla cream, Ketoprofen and Piroxicam. (*Id.*)

Colon returned to Dr. Herman for a follow-up appointment on June 27, 2013, December 19, 2013, and January 16, 2014. (*Id.* at 352, 337, 335.) On June 27, 2013, Dr. Herman recommended the continued use of the compound cream and the night splint. (*Id.* at 352.) On December 19, 2013, Dr. Herman determined that Colon still suffered from Achilles tendonitis and a calcaneal spur. (*Id.* at 337.) Colon reported that he feels pain in his left ankle with the first step in the morning. (*Id.*) Despite his continuing pain, he had missed multiple appointments regarding his Achilles tendonitis. (*Id.*) In regards to his calcaneal spur, Dr. Herman ordered that Colon receive an x-ray of his feet. (*Id.*) On January 16, 2014, Dr. Herman directed him to use the night splint more often and for longer periods of time. (*Id.* at 335.)

On February 6, 2014, Colon returned to Dr. Herman and reported that although he was using the night splint more often, he still experiences pain with the first step after resting and with direct pressure on the affected heel. (*Id.* at 331.)

On March 20, 2014, Colon went to Dr. Herman and reported that he was then going for

physical therapy, but he still experiences pain with his first step after resting, and with direct pressure on the affected left heel. (*Id.* at 326.) Specifically, he feels pain at the insertion of the Achilles tendon to the calcaneus. (*Id.*) Dr. Herman recommended the continued use of the night splint more often and for longer periods of time and referred Colon to Dr. Douglas Campbell to evaluate for surgical correction. (*Id.*)

### v. Rebecca Summers, M.D., Treating Physician (March 2013 – August 2014)

On March 1, 2013, Colon went to Rebecca Summers, M.D.,[1] at CABS Health Center for an appointment regarding pain in his knees and back. (*Id.* at 367.) Dr. Summers adjusted Colon's hypertension medication and refilled the Tramadol to alleviate back pain. (*Id.* at 367–68.) She instructed him to take 50 milligrams of Tramadol every four hours. (*Id.* at 368.)

On March 29, 2013, Colon returned to Dr. Summers at the CABS Health Center due to reported pain. (*Id.* at 364.) Dr. Summers refilled his Hydrochlorothiazide and Atenolol tablets to treat his hypertension. (*Id.* at 365.) For his chronic obstructive pulmonary disease exacerbation ("COPD"), he started Colon on Combivent aerosol, Azithromycin tablets, and Albuterol Nebulization Solution. (*Id.*)

On April 10, 2013, Colon once again visited Dr. Summers for a follow-up appointment. (*Id.* at 360.) He did not have any new complaints. (*Id.*) Dr. Summers evaluated his bilateral knee pain and referred him to physical therapy. (*Id.* at 361.) Colon walked with a cane and was taking 50 milligrams of Tramadol as needed for pain every four hours. (*Id.* at 360.) He had quadriceps tendinosis, bilateral knee arthritis, and meniscal tear, as well as ACL and MCL sprains. (*Id.* at 361.)

On May 17, 2013, Colon went to Dr. Summers again for left heel pain. (*Id.* at 356.) He

---

[1] Dr. Summers appears to have replaced Dr. Spieler as Colon's treating physician as of March 2013.

had started physical therapy, but he was told that the number of sessions approved were limited. (*Id.*)  Colon also reported that he had taken Tylenol, Tramadol, and Ibuprofen with little effect on controlling his pain.  (*Id.*)

On June 28, 2013, Colon went to Dr. Summers with complaints that his back pains had gotten worse due to pinched nerves.  (*Id.* at 349.)  He sought treatment for hypertension, back pain, tobacco use disorder, and hyperlipidemia.  (*Id.* at 349–50.)  After evaluation, Dr. Summers determined that Colon had 5/5 muscle strength in his lower extremities.  (*Id.* at 349.)

On July 17, 2013, Colon returned to Dr. Summers for a follow-up appointment regarding his hypertension, hyperlipidemia, tobacco use disorder, back pain, and COPD.  (*Id.* at 347.)  They agreed to schedule another follow up appointment after Colon's Medicaid was reinstated.  (*Id.*)

On November 7, 2013, Colon visited Dr. Summers and reported that he experienced continued bilateral knee pain and difficulty walking.  (*Id.* at 406.)  His back pain made it difficult for him to sit for a length of time.  (*Id.*)  Furthermore, he had used up his allotment of physical therapy sessions.  (*Id.*)  At this time, Colon's Medicaid had been reinstated.  (*Id.*)

On November 13, 2013, Colon visited Dr. Summers with complaints of a pinched nerve in his back and knees.  (*Id.* at 342.)  Colon was previously referred to orthopedic surgery, but he never went for an evaluation of his right knee and back.  (*Id.*)  He continued to smoke approximately four to five cigarettes a day.  (*Id.*)  Dr. Summers determined that Colon's muscle strength was 4/5 bilaterally in his lower extremities, and he had tenderness in his lumbar spine.  (*Id.*)  Colon also used a cane to walk and had difficulty getting onto the examining table.  (*Id.*)  Dr. Summers referred him for an orthopedic evaluation of the knee and lumbar spine.  (*Id.*)

On November 29, 2013, Colon returned to Dr. Summers to discuss lab results regarding

his transaminitis.  (*Id.* at 339.)  After examination, she determined that his lungs were clear to auscultation bilaterally without any wheezing.  (*Id.*)  The medical record notes that Colon used a cane and walked with a limp.  (*Id.*)  Dr. Summers also recommended treatments for Colon's back pain, herniated disc, hypertension, and reactive airway disease.  (*Id.*)  She prescribed Tramadol for lower back pain and Trazodone for insomnia.  (*Id.* at 340.)

On January 17, 2014, Colon visited Dr. Summers for a checkup regarding his lower back pain.  (*Id.* at 333.)  At this time, Colon weighed 197 pounds, and his BMI was 35.49.  (*Id.*)  His back pain appeared to be worsening over time.  (*Id.*)  Colon had recently gone to an orthopedist, where he was then referred to Bellevue Hospital for surgical evaluations.  (*Id.*)  During the appointment, Colon requested a prescription for physical therapy and complained that he had difficulty sleeping, despite taking both Tramadol and Trazodone.  (*Id.*)  Dr. Summers referred him to an orthopedist for evaluation of his knee and lumbar spine, and asked him to reschedule pulmonary function testing.  (*Id.*)

On February 28, 2014, Colon went to Dr. Summers for a follow-up appointment with complaints regarding back and knee pain.  (*Id.* at 328.)  Colon had visited an orthopedic surgeon who told him that he needed a more recent MRI of the affected areas.  (*Id.*)  The medical report indicated that he was obese, walked with a cane, and experienced visible shortness of breath while ambulating as well as bilateral diffuse expiratory wheezing.  (*Id.*)  During the appointment, Colon indicated that he ran out of his high blood pressure medications.  (*Id.*)  Dr. Summers assessed that Colon continued to experience a herniated disc of the lumbar spine, COPD, osteoarthritis, and hyperlipidemia.  (*Id.*)

On April 4, 2014, Dr. Summers refilled the Tramadol prescription and instructed Colon to take 50 milligrams every six hours for his chronic back pain.  (*Id.* at 385.)

On April 28, 2014, Colon returned to Dr. Summers for a follow-up appointment. (*Id.* at 383.) Results of an MRI scan taken on April 21, 2014 revealed severe left retrocalcaneal bursitis and mild Achilles tendonitis. (*Id.*) Dr. Summers prescribed 5 milligrams of Oxycodone every six hours to ease back pain. (*Id.* at 384.) She also assessed that Colon continued to suffer from Achilles bursitis, hypertension, osteoarthritis generalized, and a herniated disc. (*Id.* at 383.)

On July 9, 2014, Colon visited Dr. Summers for a follow-up on his herniated disc and hypertension. (*Id.* at 376.) Colon recalled that he fell and hit the left side of his body two days earlier and that he felt pain when he took a deep breath. (*Id.*) A urine toxicology test returned positive for cocaine but Colon denies ever having used it. (*Id.*) Dr. Summers assessed that Colon continued to suffer from osteoarthritis generalized, hypertension, a herniated disc most symptomatic in the lumbar spine, generalized anxiety disorder, and pleuritic chest pain. (*Id.* at 376–77.)

On August 8, 2014, Dr. Summers completed a medical report regarding Colon's physical condition. (*Id.* 452.) Her diagnoses included lower back pain due to multiple-level disc disease of the lumbar spine and knee pain due to medial meniscal tears and arthritis. (*Id.* at 452.) Symptoms consisted of back and knee pain, shortness of breath, and difficulty while walking and finding a comfortable position. (*Id.*) She further noted that Colon walked with a cane and his gait was stooped over. (*Id.*) Treatments included non-steroidal anti-inflammatory drugs ("NSAID"), muscle relaxers, and some physical therapy. (*Id.*) Although his experience of pain constantly interferes with the attention and concentration required to perform simple work tasks, Dr. Summers indicated that he can tolerate low-stress jobs. (*Id.* at 453.)

The medical report also specified that Colon was limited in movement. He could walk less than one block without rest or pain, could sit for a maximum duration of five minutes at one

time, and could stand at one time for roughly five to ten minutes.  (*Id.* at 453.)  In addition, he could sit for less than two hours and stand or walk for less than two hours in an eight-hour working day.  (*Id.* at 454.)  He also has to walk about 13 to 14 times throughout the day for roughly one to five minutes at a time.  (*Id.*)  Dr. Summers opined that Colon needed a job that permitted unscheduled breaks and shifting positions at will from sitting, standing, and walking. (*Id.*)  She further determined that he could occasionally[2] lift up to 10 pounds and occasionally twist his body.  (*Id.* at 454–55.)  He could rarely[3] stoop or climb stairs and could never crouch/squat or climb ladders.  (*Id.* at 455.)

### vi.     Daniel Napolitano, M.D.

On June 9, 2014, Colon went to Dr. Daniel Napolitano, M.D., at CABS Health Center, for an appointment regarding severe back and knee pain.  (*Id.* at 379.)  Dr. Napolitano noted that Colon's back pain radiated to his legs and that he experienced bilateral knee pain while climbing stairs and walking.  (*Id.*)  Furthermore, he assessed that Colon possessed full range of motion in his spine with no bony tenderness and that his strength in all muscle groups was intact.  (*Id.* at 380.)  Dr. Napolitano also found paraspinal tenderness in the lumbar region, and the bilateral straight leg raising test measured at 30 degrees.  (*Id.*)  During the appointment, Colon requested pain medication and reported that physical therapy failed to improve his well-being despite having attended all approved sessions.  (*Id.* at 379.)  For the herniated disc, Dr. Napolitano prescribed Trazodone, Mobic, Cyclobenzaprine HCI and Lidoderm Patch, in addition to referring Colon to pain management and neurosurgery.  (*Id.* at 380.)  Dr. Napolitano also noted that Colon suffers from generalized anxiety disorder and referred him for psychiatric treatment.  (*Id.*)

---

[2] Here, "occasionally" means 6% to 33% of an eight-hour working day.  (Admin. R. at 453.)

[3] Here, "rarely" means 1% to 5% of an eight-hour working day.  (Admin. R. at 453.)

#### d. Consultative Medical Examiners

##### i. Louis Tranese, D.O. (December 2012)

On December 14, 2012, Colon was referred to Dr. Louis Tranese, D.O., for an orthopedic examination at the request of the Social Security Administration ("SSA"). (*Id.* at 303.) Colon complained of bilateral knee pain that had persisted for the past five to seven years. (*Id.*) He graded the pain 7/10 and characterized it as a "dull ache" that was aggravated by weight-bearing activities such as stair climbing, walking, standing for long periods, and squatting or kneeling. (*Id.*) His pain was relieved minimally and temporarily with position changes, rest, refraining from weight-bearing activities, and anti-inflammatory medication. (*Id.*) Furthermore, he complained of pain in his lower back, which he graded at 8/10 and described as a "dull, stiff crampy ache" that is both daily and persistent. (*Id.*)

On examination, Colon was five feet and two inches tall, weighed 188 pounds, and his blood pressure was measured at 130/190. (*Id.* at 304.) He appeared to be in no acute distress. (*Id.*) He walked with an antalgic gait, could walk on his heels and toes with a limp, and had difficulty squatting beyond 50% maximum capacity due to knee pain. (*Id.*) He was prescribed a cane by his physician. (*Id.*) Dr. Tranese opined that the cane was medically necessary for long distance, outdoor ambulation. (*Id.*) Colon could rise from the chair without difficulty and needed no help in changing his clothes or getting on or off the exam table. (*Id.*) In addition, Colon reported he was independent in bathing, dressing, and grooming, and completed laundry by himself once a week. (*Id.*) However, his family and friends assisted him with cooking and cleaning. (*Id.*)

Dr. Tranese determined that Colon experienced full flexion, extension, bilateral lateral flexion, and bilateral rotary movements in his cervical spine. (*Id.* at 305.) He also had full range

of motion in his upper extremities including his shoulders, elbows, forearms, wrists, and fingers. (*Id.*)  In his thoracic and lumbar spines, flexion was measured at 50 degrees, and lateral flexion and rotation were limited to roughly 15 degrees bilaterally due to pain.  (*Id.*)  He complained of generalized lower lumbar paraspinal tenderness.  (*Id.*)  Upon examination, there was no sacroiliac joint or sciatic notch tenderness but there was mild lumbar spasm in the paraspinal region.  (*Id.*)  There was no scoliosis or kyphosis observed.  (*Id.*)  The straight leg raising test was negative bilaterally but it was noted that Colon had moderate bilateral hamstring muscle tightness.  (*Id.*)

In his lower extremities, Colon had a limited range of motion in his knees.  In his right knee, his range of motion showed an extension of zero degrees and flexion of 125 degrees.  (*Id.*)  In his left knee, his range of motion showed an extension of -10 degrees and a flexion of 120 degrees, limited by functional restriction and pain.  (*Id.*)  There was mild medial joint line tenderness of the knees, pain on patellar compression, and limited knee and left ankle jerk reflexes.  (*Id.*)  Dr. Tranese indicated that there was minimal inflammation of the knees bilaterally, but no effusion or instability.  (*Id.*)  Colon also had full strength in his lower extremities and no sensory abnormalities or muscle atrophy.  (*Id.*)

Dr. Tranese diagnosed Colon with (1) chronic lower back pain; (2) multi-level lumbar disc disease including bulges and herniation; (3) spondylosis of the lumbar spine; (4) bilateral knee osteoarthritis with right medial meniscus tear; (5) ACL and MCL sprains; and (6) hypertension.  (*Id.* at 305–06.)  He opined that Colon had:  (1) a moderate limitation for heavy lifting, squatting, kneeling, crouching, and frequent stair climbing; (2) a mild to moderate limitation for walking long distances and frequent or sustained bending; (3) a minimal restriction for standing for long periods; and (4) a moderate restriction with heavy lifting.  (*Id.* at 306.)  Dr.

Tranese did not list any limitations for sitting.  (*Id.*)

### ii.  Chaim Shtock, D.O.

On July 18, 2014, Colon was referred to Dr. Chaim Shtock, D.O., for an orthopedic examination by the Division of Disability Determination at the request of the SSA.  (*Id.* at 313.) Colon reported that he had experienced low back and bilateral knee pain since 2010.  (*Id.*)  As treatment, he had attended physical therapy since 2010.  (*Id.*)  Furthermore, Colon stated that he had experienced pain in the posterior aspect of the left heel since 2012.  (*Id.*)

During the appointment, Colon reported that his lower back pain ranged from a five to an eight on a scale of one to ten for severity and that the pain radiated to the right buttock.  (*Id.*) The pain was aggravated with excessive bending, heavy lifting, prolonged walking, and sitting. (*Id.*)  Colon also complained of bilateral knee pain, which he rated as 5/10, and characterized as a dull ache aggravated by prolonged walking and standing.  (*Id.*)  Furthermore, he reported pain in the posterior aspect of his left heel, which he rated 5/10 in severity, and indicated that it was aggravated by prolonged walking.  (*Id.*)  He reported that his lower back, bilateral knee, and left heel pain was relieved by rest, refraining from aggravating activities, and medication.  (*Id.*)

Colon reported that he was independent in showering, dressing, bathing, grooming, light cooking, and shopping.  (*Id.* at 314.)  However, he depended on his mother's assistance for cleaning and laundry.  (*Id.*)  His daily activities included:  watching television, listening to the radio, and socializing with friends.  (*Id.*)  He smoked 10 cigarettes a day and consumed 10 cans of beer during the weekends.  (*Id.*)

On examination, Colon was 63 inches tall, weighed 189 pounds, and his blood pressure was 150/98 and asymptomatic.  (*Id.*)  He did not appear to be in any acute distress and had a normal stance.  (*Id.* at 315.)  He limped, and his gait was antalgic.  (*Id.*)  He declined to walk on

his toes and heels and was unable to squat beyond 25% of maximum capacity. (*Id.*) Furthermore, Colon used a cane for outdoor ambulation; however, he could ambulate without the cane during the entire evaluation. (*Id.*) During the appointment, he needed no help changing his clothes or getting on or off the exam table. (*Id.*) However, he experienced some difficulty rising from a chair due to his back pain. (*Id.*)

In regards to his cervical spine, Colon experienced full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally. (*Id.*) In his upper extremities, he had full range of motion in his shoulders, elbows, forearms, wrists, and fingers, and 5/5 strength in proximal and distal muscle. (*Id.*) Furthermore, he experienced no muscle atrophy, sensory abnormality, or reflex deficits. (*Id.*) In his thoracic and lumbar spine, flexion was 30 degrees, extension was zero degrees, and lateral flexion and rotary movements were 15 to 20 degrees bilaterally. (*Id.*) There was no scoliosis, kyphosis, trigger points, spasms, or sacra-iliac joint or sciatic tenderness, but Colon reported tenderness in the lumbar paraspinal. (*Id.*) The straight leg raising test was positive at 30 degrees on the right side and 35 degrees on the left. (*Id.*)

Dr. Shtock also evaluated Colon's lower extremities. Right hip flexion was performed to 80 degrees and internal hip rotation to 25 degrees. (*Id.*) Left hip flexion was performed to 90 degrees and internal hip rotation to 30 degrees. (*Id.*) Colon had limited range of motion in the knees; he had an extension of -10 degrees and flexion of 120 degrees on the right, and extension of zero degrees and flexion of 140 degrees in the left. (*Id.*) Dr. Shtock observed positive swelling of the anterior aspect of the right knee. (*Id.* at 315–16.) A positive lump and tenderness was noted on gross evaluation of the posterior aspect of the left heel. (*Id.* at 315.) Overall, Colon had 4+/5 strength in the proximal muscles and 5/5 in the distal muscles bilaterally, with no muscle atrophy, sensory abnormality, joint effusion, inflammation, or instability. (*Id.* at 316.)

Reflexes were physiologic and equal.  (*Id.*)

Overall, Dr. Shtock diagnosed Colon with a reported history of: (1) lower back pain; (2) bilateral knee pain; (3) left heel pain; (4) gait dysfunction; (5) hypertension; (6) asthma; and (7) depression.  (*Id.*)  His current medications included: Tramadol, 50 milligrams; Lisinopril, 20/25 milligrams; Combivent; and Trazodone, 50 milligrams.  (*Id.* at 314.)  Dr. Shtock opined that Colon had mild limitations for heavy lifting, kneeling, and standing and sitting for long periods; Colon also had moderate to marked limitations for squatting, crouching, frequent stair climbing, walking long distances, and frequent bending.  (*Id.* at 316.)

Dr. Shtock also completed a medical source statement regarding Colon's ability to complete physical work-related activities.  (*Id.* at 319.)  He indicated that Colon could: lift and carry up to 10 pounds occasionally; sit 15–20 minutes at a time without interruption; stand 10–15 minutes at a time without interruption; and walk 10–15 minutes at a time without interruption.  (*Id.* at 319–20.)  Within an eight-hour workday, Colon could sit for a total of four hours, stand for two hours, and walk for two hours.  (*Id.* at 320.)  He determined that Colon's use of a cane was medically necessary and that he could only ambulate about six to eight steps without it.  (*Id.*)  With the cane, he could use his free hand to carry small objects.  (*Id.*)  Dr. Shtock further opined that Colon could: frequently[4] use his hands for reaching, handling, and fingering; occasionally climb stairs and ramps; and occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.* at 320–22.)  Colon could tolerate occasional exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity or wetness, dust odors, fumes and pulmonary irritants, extreme cold, extreme heat, and vibrations.  (*Id.* at 323.)  Furthermore, he could not walk at a reasonable pace on rough or uneven surfaces.  (*Id.* at 324.)

---

[4] For purposes of this matter, "frequently" means one-third to two-thirds of the time.  (Admin. R. at 319.)

### e.  Vocational Expert Evidence

A vocational expert ("VE"), Christina Boardman, testified at the ALJ hearing.  (*Id.* at 56–62.)  Specifically, the ALJ asked the VE to consider a series of hypotheticals regarding the employment options of an individual who has the same age, education, and work experience as Colon.  (*Id.* at 57.)  In the first hypothetical, she was asked to assume that:  (1) the individual retained the functional capacity for sedentary work[5] but could not crawl or climb ladders, ropes, or scaffolds; (2) on less than an occasional basis, the individual could squat, crouch, and stoop; and (3) on an occasional basis, he could climb ramps and stairs, balance, and kneel.  (*Id.* at 57–58.)  The VE testified that such a person could become:  (1) a clerk (Dictionary of Occupational Title ("DOT") code 209.567–014) of which there are 200,000 jobs in the national economy; (2) a table worker (DOT code 739.687–182) of which there are 400,000 jobs in the national economy; or (3) an assembler (DOT code 734.687–018) of which there are 100,000 jobs in the national economy.  (*Id.* at 58.)  However, the VE cautioned that these jobs would not be available if:  (1) the individual had to miss more than two days of work a month; (2) he was off task for more than ten percent of the time; and (3) he was unable to lift and carry at least 10 pounds even occasionally.  (*Id.* at 61.)

In the second hypothetical, the ALJ asked the VE to consider the factors from the first hypothetical in addition to the assumption that the individual could lift 10 pounds occasionally, could walk for a total of two hours in an eight-hour workday, and required a sit/stand option during working hours.  (*Id.* at 59.)  The VE testified that the employment options from the first hypothetical would once again apply.  (*Id.* at 59–60.)  She further clarified that clerks, table

---

[5] Sedentary work generally involves, "up to two hours of standing or walking and six hours of sitting in an eight-hour work day."  SSR 83-10, 1983 WL 31251 (Jan. 1, 1983); *see Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

workers, and assemblers all performed their jobs at a table and did not rely on a conveyer belt or other employees. (*Id.* at 59.) However, she stated that her opinion regarding the viability of a sit/stand option in the jobs above were based on her professional knowledge and experience rather than the DOT. (*Id.* at 60.)

In the third hypothetical, the ALJ asked the VE to consider the factors from the first and second hypotheticals in addition to the assumption that the individual could sit, stand, and walk for a total of two hours each in an eight-hour workday and that he could only work at jobs where he would be allowed to miss more than four days of work per month due to lower back and bilateral knee pain. (*Id.*) The VE testified that there were no jobs in the national economy that this hypothetical individual could perform. (*Id.* at 61.)

## STANDARD OF REVIEW

### I. Review of Denial of Benefits

When reviewing the final determination of the Commissioner, the Court does not make an independent determination about whether a claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence

and evidence from which conflicting inferences can be drawn." (*Id.*) (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.    Eligibility Standard for SSI and DIB

To qualify for SSI and DIB benefits, an individual must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments are defined as "anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the Commissioner engages in the following five-step analysis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is

listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. § 404.1520. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

**I.    The ALJ Properly Followed the Five-Step Analysis**

First, the ALJ determined that Colon is currently not engaged in substantial gainful activity. (Admin. R. at 225.) Although Colon stopped working on May 10, 2010, he reported that his condition became too severe to return to work by January 1, 2012. (*Id.*)

Second, the ALJ found that Colon suffered from "severe impairments" that restrict his ability to complete basic work activities. (*Id.* at 17–18.) Colon has been diagnosed with lumbago and multi-level disc disease of the lumbar spine, medial meniscal tears of the right knee, degenerative arthritis of the left knee, and Achilles tendinitis of the left heel. (*Id.* at 297–301, 337.) The record also indicates that these medically determinable impairments have been "severe" for a continuous period of over 12 months. (*Id.* at 18.) Colon has additionally been diagnosed with hypertension, hyperlipidemia, and asthma. (*Id.*) His height, weight, and BMI also suggest obesity. (*Id.*) However, the ALJ found that these impairments are not severe because the record does not document any complications or resulting functional limitations. (*Id.*)

Third, the ALJ found that Colon's severe impairments did not meet the criteria listed in 20 C.F.R. Part 404, Subpart P, App'x 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  (Admin. R. at 19.)  The ALJ found that Colon's joint and back impairments do not qualify, even when considered in conjunction with obesity, because there is no evidence of any major dysfunction of a joint or disorder of the spine that causes:  (1) gross anatomical deformity; (2) compromise of nerve root; or (3) inability to perform fine and gross movements.  (*Id.*)

Fourth, the ALJ determined that Colon is unable to perform any past relevant work as a security guard because it requires conduct that exceeds his Residual Functional Capacity ("RFC").  (*Id.* at 22.); *see* 20 C.F.R. §§ 404.1565, 416.965.  However, the ALJ found that Colon has the RFC to perform sedentary work with the following limitations:

1. Can only lift or carry up to 10 pounds occasionally;
2. Can only walk for a total of two hours in an eight-hour workday;
3. Can squat, crouch, and stoop on a less than occasional basis;
4. Can climb ramps and stairs, balance, and kneel on an occasional basis;
5. Cannot crawl, climb ladders, ropes, or scaffolds;
6. Needs to alternate sitting and standing at will;

(*Id.*); 20 C.F.R. §§ 404.1567(a), 416.967(a).

Fifth, the ALJ considered Colon's age, education, RFC, and the VE's testimony, and found that there were jobs that existed in significant numbers in the national economy that he could perform despite his impairments.  (Admin. R. at 22.)  Accordingly, the ALJ found that the Commissioner had carried her statutory burden.  (*Id.* at 24.)

## II.    The ALJ Properly Applied the Treating Physician Rule

In making Colon's RFC determination, the ALJ properly considered each of the medical source opinions in the record.  The ALJ properly applied the Commissioner's regulations when

he assigned greater weight to the opinions of the consultative examiners, Dr. Tranese and Dr. Shtock, than to the opinion of one of Colon's treating physicians, Dr. Summers.

Generally, opinions of treating physicians are given "controlling weight" because they "provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). However, opinions of treating physicians must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" as well as "not inconsistent" with other substantial evidence in record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). In other words, an ALJ's RFC determination does not have to correspond perfectly to any single medical opinion as long as it is consistent with the record as a whole. *Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013). The ALJ must also provide "good reason" for assigning a certain weight to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("the ALJ must comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.") (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

In a physical RFC questionnaire dated August 8, 2014, Dr. Summers determined that Colon was limited in his ability to move and function, finding that he could sit for less than two hours and stand or walk for less than two hours in an eight-hour workday. (Admin. R. at 452.) The ALJ afforded Dr. Summers' opinion little weight because she had only examined Colon's back and knees on two occasions – June 28 and November 13, 2013 – and her conclusions about the impact of his impairments on his capacity to work were inconsistent with her treatment notes. (*Id.* at 20, 249, 342.) Dr. Summers determined that Colon's muscle strength in his lower

extremities was 5/5 in June, and 4/5 in November. (*Id.*) As indicated in the ALJ's decision, these results are inconsistent with her August 8 report. Dr. Summers' infrequent examination plus the inconsistency between her conclusion and her treatment notes provide good reason to accord her opinion little weight. *See* 20 C.F.R. § 404.1527(c)(2)(i)–(ii) (the longer the doctor-patient relationship and the more the treating physician knows about the claimant's impairment, the more weight the ALJ will accord his or her opinion).

Furthermore, substantial evidence in the record supports the ALJ's decision to accord little weight to Dr. Summers' conclusions about Colon's limited ability to work. Indeed, her conclusions are inconsistent with the findings of Colon's other treating physician, Dr. Napolitano, as well as with Dr. Tranese's and Dr. Shtock's conclusions. *See, e.g.*, *Heitz v. Comm'r of Soc. Sec.*, F. Supp. 3d 413, 421 (S.D.N.Y. 2016) (holding that a treating physician's opinion should be rejected because it is internally inconsistent and contradicted by other medical evidence).

Dr. Napolitano, for instance, found that Colon possessed a full range of motion and that his muscle strength was intact. (Admin R. at 380.) Both Dr. Tranese and Dr. Shtock indicated that Colon's examination reports were generally "within normal limits." (*Id.* at 20.) In contradiction to Dr. Summers' opinion, Dr. Tranese found that Colon had no limitation with respect to sitting, and Dr. Shtock found that Colon had only a mild limitation with sitting for long periods. (*Id.* at 306, 316.) Dr. Tranese found that Colon had a mild to moderate limitation for walking long distances and a minimal restriction for standing for long periods. (*Id.* at 306.) Dr. Shtock similarly found that Colon had a moderate to marked limitation for walking long distances and a mild limitation for standing for long periods. (*Id.* at 316.) He also noted that

Colon used a cane for walking, but, upon examination, Colon was able to walk without the help of his cane. (*Id.* at 315.)

Colon's objective medical findings, too, do not support Dr. Summers' extreme restrictions. Colon's MRIs are consistent with his severe impairments. Nevertheless, Colon's lumbar MRI revealed thin central disc herniations, which resulted in only mild central canal stenosis and mild bilateral intervertebral foraminal encroachment. (*Id.* 300–01.) Similarly, the knee MRIs showed mild abnormalities. (*Id.* at 297–99.)

"[W]hile the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino*, 312 F.3d at 588. It is the job of the ALJ to resolve any genuine disputes in the evidence. *Burgess*, 537 F.3d at 128; *Veino*, 312 F.3d at 588. Overall, substantial evidence supports the conclusion that Dr. Summers' medical opinions are inconsistent internally, and contrary to the reports of Dr. Tranese and Dr. Shtock. Therefore, the ALJ was entitled to give greater weight to the consultative physicians' opinions.

## III.  Substantial Evidence Supports the ALJ's RFC Determination

The ALJ is solely responsible for determining the claimant's RFC. 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c). In doing so, the ALJ assesses the claimant's ability to perform certain work-related activities by considering all medical opinions together with other relevant evidence. 20 C.F.R. § 416.945(a)(2)–(3). Colon has the burden of providing evidence that establishes his inability to perform substantial gainful activity. More specifically, he must show a medically demonstrable underlying physical or mental impairment, which could reasonably be expected to produce the alleged disabling symptoms. 20 C.F.R. § 404.1529(b); *accord Gallagher v. Schweiker*, 697 F.2d 82, 84 (2d Cir. 1983). It is the job of the ALJ to resolve any

genuine conflicts in the evidence. *Veino*, 312 F.3d at 588; *Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.")

Based on the entire record, the ALJ reasonably concluded that Colon had the RFC to perform sedentary work. Substantial evidence supports this determination. Specifically, the ALJ's conclusion is supported by the medical opinions of consultative examiners Dr. Tranese and Dr. Shtock. Dr. Tranese indicated that the claimant appeared to be in no distress, had a normal stance, could rise from his chair without difficulty, and required no help changing for the examination and getting on or off the examination table. (*Id.* at 304.) He also reported that Colon had no sacro-iliac joint or sciatic notch tenderness, no scoliosis or kyphosis, and the straight leg raising test was negative bilaterally. (*Id.* at 305.) In his cervical spine, Colon had full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally. (*Id.*) In his upper extremities, he experienced no muscle atrophy or motor, sensory, reflex, or strength deficits. (*Id.*) Furthermore, there was no effusion, instability, sensory abnormalities, or muscle atrophy in his lower extremities. (*Id.*) Inflammation was only minimal. (*Id.*) Dr. Tranese also opined that Colon had only a mild to moderate restriction with walking long distances and frequent or sustained bending, and a minimal restriction with standing for long periods. (*Id.* at 306.) According to the ALJ, Dr. Tranese's medical opinion suggests that Colon's physical condition was "within normal limits," and thus, he could perform sedentary work. (*Id.* at 20.)

Dr. Shtock similarly reported that Colon appeared to be in no acute distress, had a normal stance, could ambulate without his cane during the entire evaluation, and required no help changing for the examination or getting on or off the examination table. (*Id.* at 315.) His cervical spine and upper extremities were intact, and he experienced no spasms, scoliosis, kyphosis, trigger points, or sacra-iliac joint or sciatic notch tenderness in his thoracic and lumbar

spine.  (*Id.*)  In his lower extremities, Colon had 4+/5 strength in the proximal muscles and 5/5 in

the distal muscles bilaterally, with no muscle atrophy, sensory abnormality, joint effusion,

inflammation, or instability.  (*Id.* at 315–16.)

The ALJ specifically took into account the restrictions that Drs. Tranese and Shtock

noted in their reports.  Thus, he found that Colon must alternate sitting and standing at will, and

can walk for a total of two hours in an eight-hour workday.  (*Id.* at 22.)  He cannot climb ladders,

and can crouch and stoop only on an occasional basis.

Dr. Shtock's and Dr. Tranese's conclusions are compatible with the demands of

sedentary work.  Sedentary work requires that an individual be able to stand and/or walk up to

two hours in an eight-hour workday.  *See* SSR 96–9p.  Dr. Shtock noted that Colon is able to

stand and walk for two hours each.  (*Id.* at 320.)  Colon argues that Dr. Shtock's assertion that

Colon has "minimal restrictions with standing" is overly vague and thus cannot serve as a basis

to determine a claimant's RFC.  (Pl.'s Mem. at 22.)  Courts in the Second Circuit, however, have

held that the term "minimal restrictions" is not vague – in fact, it is regularly used to determine a

claimant's RFC.  *See, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 131 (2d Cir. 1999) (holding that a

claimant who experienced "minimal restriction of movement" was still employable in "semi-

sedentary capacity").  Furthermore, Dr. Shtock specified that Colon can stand for two hours.

(Admin R. at 320.)  Accordingly, substantial evidence in the record supports the ALJ's

determination that Colon is capable of performing sedentary work with certain restrictions.

IV.    **Substantial Evidence Supports the ALJ's Credibility Determination**

A credibility finding by an ALJ is entitled to deference by a reviewing court "because

[the ALJ] heard [the] plaintiff's testimony and observed [the plaintiff's] demeanor."  *Gernavage*

*v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995).  The ALJ must analyze the credibility

of a claimant as to his symptoms through a two-step test.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d

Cir. 2010).  The ALJ must first decide "whether the claimant suffers from a medically

determinable impairment that could reasonably be expected to produce the symptoms alleged."

*Id.* (citing 20 C.F.R. § 404.1529(b)).  Next, if the ALJ determines that the claimant does have

such an impairment, he must consider "'the extent to which the claimant's symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence' of

record."  *Id.* (quoting 20 C.F.R. § 404.1529(a) (alterations omitted)).  When evaluating the

"intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require

consideration of seven specific, *objective* factors . . . that naturally support or impugn *subjective*

testimony of disabling pain and other symptoms."  *Dillingham v. Colvin*, No. 14-CV-105 (ESH),

2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015).  These seven objective factors are:

> (i) [the] claimant's daily activities; (ii) [the] location, duration[,] frequency,
> and intensity of [the] claimant's pain or other symptoms; (iii) precipitating
> and aggravating factors; (iv) [the] type, dosage, effectiveness, and side effects
> of any medication . . . taken to alleviate [the claimant's] pain or other
> symptoms; (v) treatment, other than medication, [the] claimant receives or has
> received for relief of her pain or other symptoms; (vi) measures [the] claimant
> uses or has used to relieve pain or other symptoms; and (vii) other factors
> concerning [the] claimant's functional limitations and restrictions due to pain
> or other symptoms.

*Id.* at *5 n.22 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)).  "While it is 'not sufficient for the

ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the

relevant factors, remand is not required where 'the evidence of record permits [the Court] to

glean the rationale of the ALJ's [credibility] decision.'"  *Cichocki v. Astrue*, 534 F. App'x 71, 76

(quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).  In such a case, "the ALJ's

failure to discuss those factors not relevant to [his] credibility determination does not require

remand."  *Id.*

Here, the ALJ followed the two-step process in considering Colon's symptoms. (Admin. R. at 19.) First, he determined that Colon experienced medically determinable impairments that could reasonably cause the relevant symptoms. (*Id.*) However, at step two, the ALJ found that Colon's testimony regarding his functional capabilities was unreliable. (*Id.* at 19–20.) While the medical record corroborates Colon's allegations of back, knee, and heel pain, it does not justify assigning a more severe RFC than that determined by the ALJ. (*Id.*) During both Dr. Tranese's and Dr. Shtock's evaluations, Colon reported that he was independent in bathing, dressing, and grooming, and completed laundry by himself once a week. (*Id.* at 304.) His daily activities also included going to the store, preparing light meals, taking out the garbage, browsing the internet, watching television, listening to the radio, and socializing with friends. (*Id.* at 49, 51, 50, 314.) Colon's daily activities do not suggest functional limitations greater than those identified in the ALJ's RFC determination. (*Id.* at 19–20.) Colon's treatment notes do not document that his medications made him drowsy, as he claimed at the hearing.

Courts in the Second Circuit have held claimant testimony regarding his or her inability to work as unreliable when the claimant had engaged in daily activities similar to those of Colon. *See, e.g.*, *Cohen v. Astrue*, No. 07-CV-535 (DAB) (HBP), 2011 WL 2565659, at *21 (S.D.N.Y. May 17, 2011) (upholding the ALJ's determination that the claimant's testimony was not credible because the claimant could drive a car, visit others, take out the garbage, grocery shop, and visit a social club). The objective medical evidence outweighs Colon's complaints of pain and his contention that he is unable to work. The extensive medical record provides substantial evidence in support of the ALJ's credibility determinations. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence.")

**V.    Substantial Evidence Supports the ALJ's Finding that Colon Was Capable of Performing a Significant Number of Jobs in the National Economy**

At step five of the disability analysis, the ALJ must consult the applicable Medical

Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2.  *See Bapp v. Bowen*,

802 F.2d 601, 604 (2d Cir. 1986).  However, where, as here, a claimant has both exertional and

nonexertional impairments, the ALJ is entitled to rely on the opinion of a vocational expert.  *See*

*Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983).  An ALJ may rely on a vocational

expert to determine whether there is work that exists in significant numbers in the national

economy that a claimant could perform, given his vocational factors and RFC.  *Id.*

The VE considered a hypothetical individual with Colon's RFC.  (Admin. R. at 58.)  That

is, the VE was asked to consider the available jobs for an individual who: (1) had the functional

capacity for sedentary work; (2) could not crawl or climb ladders, ropes, or scaffolds; (3) could

squat, crouch, and stoop on less than an occasional basis; (4) could climb ramps and stairs,

balance, and kneel on an occasional basis; (5) could lift 10 pounds occasionally;  (6) could walk

for a total of two hours in an eight-hour workday; (7) and required a sit/stand option during

working hours.  (*Id.* at 59.)  The VE reported that a person with these characteristics could

become: (1) a clerk (DOT code 209.567–014) of which there are 200,000 jobs in the national

economy; (2) a table worker (DOT code 739.687–182) of which there are 400,000 jobs in the

national economy; or (3) an assembler (DOT code 734.687–018) of which there are 100,000 jobs

in the national economy.  (*Id.* at 58.)   Based on her professional knowledge and experience, the

VE explained that these jobs would have a sit/stand option available.  *Id.*

Colon argues that SSR 83-12 provides that unskilled work does not permit individuals to

walk away from their workstation, and are "particularly structured so that a person cannot

ordinarily sit and stand at will."  SSR 83-12, 1983 WL 31253 (Jan. 1, 1983); (Pl.'s Mem. at 23–

24).  However, "in cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base."  SSR 83-12, 1983 WL 31253 (Jan. 1, 1983).  Here, the VE clarified that the relevant occupations for a person with Colon's RFC would include a sit/stand option.[6]  (Admin. R. at 58.)

That Colon could perform jobs available in significant numbers in the national economy provides sufficient evidence that "a reasonable mind might accept as adequate to support" the ALJ's determination.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2012) (internal quotation marks omitted).  As such, the ALJ's conclusion that Colon was not entitled to SSI and DIB is supported by substantial evidence in the record.

## CONCLUSION

For the reasons stated herein, Colon's motion for judgment on the pleadings (Doc. No. 19) is denied, and the Commissioner's motion (Doc. No. 21) is granted.  The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.


                                          SO ORDERED.

Dated:  Brooklyn, New York                *Roslynn R. Mauskopf*
        March 23, 2018
                                          _____
                                          ROSLYNN R. MAUSKOPF
                                          United States District Judge

---

[6] Similarly, Colon argues that the "constant" or "frequent" reaching, handling, and fingering – as required by the Selected Characteristics of Occupations for the jobs mentioned by the VE – cannot be accomplished in a standing position.  (Pl.'s Mem. at 23–24.)  However, a VE's "experience in job placement or career counselling" can serve as a "reasonable explanation" for potential discrepancies.  SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000); *see Miller v. Astrue*, No. 11–CV–4103 (DLI), 2013 WL 789232, at *8 (E.D.N.Y. Mar. 1, 2013).